UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARVIN DENT,

                      Plaintiff,

            -against-

UNITED STATES TENNIS ASSOCIATION,
INCORPORATED, USTA NATIONAL TENNIS
CENTER INC., and DANIEL ZAUSNER, in
his individual and official capacities,

                      Defendants.
------------------------------------------------------------X

**MEMORANDUM & ORDER**
08 CV 1533 (RJD) (VVP)

DEARIE, Chief Judge.

      Plaintiff Marvin Dent, an African-American teaching professional at the USTA National Tennis Center ("NTC"), claims that because of his race and age the defendants did not promote him to be the NTC's next Director of Tennis, instead hiring a Caucasian male seventeen years his junior. Dent asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C § 1981 ("Section 1981"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA"), the New York State Human Rights Law, New York Executive Law § 290 ("NYSHRL"), and the New York City Human Rights Law, Administrative Code § 8-101 ("NYCHRL"). Defendants move for summary judgment seeking dismissal of Dent's complaint in its entirety. The motion is granted.

## BACKGROUND

      Defendant NTC is a not-for-profit organization that operates the USTA Billie Jean King National Tennis Center, a year-round tennis facility in Flushing, New York that houses three stadiums with nearly 40,000 seats, 9 indoor courts and 22 outdoor courts. Defendant United

States Tennis Association, Inc. ("USTA") is the governing body for tennis in the United States and the sole member of the NTC. It contracts with the NTC to host the U.S. Open each year. Defendant Daniel Zausner has been the Managing Director of the NTC since July 2001. As the top official at NTC, Zausner is responsible for overseeing all of the day-to-day operations at the NTC, including overseeing NTC's tennis programs, camps, operations, capital improvements, marketing, special events, and all aspects of the U.S. Open.

One of Zausner's direct reports is the Director of Tennis. The Director of Tennis is responsible for implementing and managing all tennis programs at the NTC, including hiring, supervising, disciplining and terminating staff, developing organizational strategy, and developing and managing a multi-million dollar annual budget. The Director of Tennis has 20 full-time direct and indirect reports, including one Manager of Tennis Programs, ten Tennis Professionals (teaching professionals) and one Business Coordinator. The number of reports increases to 50 during the U.S. Open.

Bill Mountford was the NTC's Director of Tennis from 2000 to March 2007 before resigning to accept a similar role with the Lawn Tennis Association in England. Zausner, assisted by Diana Russo, the NTC's Director of Administration, and Kurt Kamperman, the USTA's Chief Executive for Community Tennis, led the search to find Mountford's replacement. The internal job description for the position that Zausner and Russo updated in conjunction with their search provides that the Director of Tennis is:

> Responsible for the overall management of the department including all tennis programs, events, and tournaments; the hiring, training, and development of the entire NTC Programs staff; to be an industry leader, publicly representing the ideals of the USTA. Directly responsible for the day-to-day operational leadership of the department.

The public job notice indicated that the NTC sought a "proven leader with senior management experience, entrepreneurial talent, with a passion and knowledge of tennis and a commitment to the USTA's core values." The job notice further provided that the successful applicant would be responsible for the overall management, financial oversight and budgeting, hiring and supervision of staff, strategic organizational development and tennis program implementation.

Approximately 90 individuals applied for the position. Without disclosing the names of those individuals that he believed were qualified, Zausner asked Kamperman to independently review resumes. Kamperman reviewed over 50 resumes and provided Zausner with the "half dozen or so [individuals] that [he] felt had the most suitable experience and expertise for the position, based on their resume." Zausner's and Kamperman's top candidates for the position were identical.

Whitney Kraft was identified as a top candidate by both Zausner and Kamperman. Russo, who conducted initial screening interviews via telephone of more than a dozen external candidates, also identified Kraft as a top candidate. At the time that he applied for the position, Kraft was the Director of Tennis for the City of Fort Lauderdale, Florida, a position that he had held for the previous ten years. As Fort Lauderdale's Director of Tennis, Kraft's responsibilities included overseeing the programming, maintenance and upkeep of 44 courts spread among nine different facilities; hiring and supervising tennis professionals, maintenance staff, and clerks; developing new tennis programs; and managing an annual million dollar budget. Prior to becoming the Director of Tennis for Fort Lauderdale, Kraft was the Director of Racquet Sports at the Boca Pointe Country Club in Boca Raton, Florida for 12 years. There, he managed 22 individuals and served 3,500 club members at a facility consisting of 29 tennis courts.

After interviewing Kraft and four other external applicants, Zausner decided that Kraft was the best qualified applicant. Kraft then met with Arlen Kantarian, the USTA's Chief Executive, Professional Tennis, and Lee Hamilton, the USTA's Executive Director and Chief Operating Officer. Shortly after those interviews, Zausner extended an offer to Kraft. Kraft accepted the offer on June 15, 2007.

Plaintiff Marvin Dent was among the 90 or so applicants who were not offered the position. In 1999, Dent was hired by the NTC to be a Tennis Professional. He continues in that role to this day. As one of the approximately ten Tennis Professionals at the NTC, Dent reports directly to the Director of Tennis. His official duties and responsibilities include on-court teaching assignments, serving as a USTA representative at various clinics/workshops, and assisting in the coordination of special events/tournaments as necessary. Almost all of Dent's work days are spent on the tennis court providing tennis instruction.

In February 2007, shortly after Mountford announced his resignation, Dent sent an email to Zausner expressing his interest in replacing Mountford. Dent was 64 years old at the time he sent his email. After reviewing Dent's resume neither Zausner nor Kamperman considered Dent to have the requisite qualifications and experience to be the NTC's next Director of Tennis. In particular, Zausner noted that Dent's resume was entirely teaching-focused; it stated that his career focus was to teach tennis "at the Highest Level," and under a section on his resume entitled "Coaching Experience," Dent listed all of his prior work experience including:

> From October 1999, he was the NTC's Director of Tournament Training Program and the Summer National Coach for the Eastern Section;
>
> From September 1988 to 1999, he was an independent contractor and "conducted private and group lessons in tennis, basketball, football and baseball specializing in balance and throwing";
>
> From June 1987 to August 1988, he was a coach on the ATP tour;

4

From February 1987 to May 1987, he was a high school varsity tennis coach;

From April 1986 to September 1986, he was a Special Consultant to the Lawn Tennis Association of Trinidad and Tobago and the Trinidad/Tobago Ministry of Education for whom "he conducted seminars throughout the country for 200 secondary school teachers to introduce tennis into the school system"; and

From October 1981 to February 1986, he was the National Trainer for Cote D'Ivoire, West Africa for which he "developed the first national team for the country."

Zausner concluded that Dent's teaching-focused resume reflected a limited amount of the administrative and managerial experience that he was looking for the next Director of Tennis to possess. Zausner also considered Dent unqualified for the position based on his observations and knowledge of Dent's performance and responsibilities at the NTC. In particular, Zausner concluded that Dent was not qualified to: (1) develop and administer a budget in the millions of dollars (Zausner Dep. Tr. at 327); (2) develop and supervise all of the NTC's lesson programs (Zausner Dep Tr. at 331.); (3) effectively recruit, hire, evaluate, train, and monitor program staff (Zausner Dep. Tr. at 334-35; 341-42.); or (4) establish teaching staff protocols (Zausner Dep. Tr. at 345). Zausner also believed that Dent's leadership skills "paled in comparison to many of the other applicants." (Zausner Dep. Tr. at 319.)

Despite concluding that Dent was not qualified for the position and that the top ten candidates for the position were all better qualified, Zausner extended Dent a courtesy interview because Dent was a senior teaching professional at the NTC and Zausner was open to being "pleasantly surprised." (Zausner Dep Tr. at 325.); see also Zausner Dep. Tr. at 374 ("By the time we interviewed [Dent], based on the information I had from his resume and from his work experience and the previous issues, it was primarily a courtesy and an opportunity to be proven

wrong and be surprised.")[1] The interview did not change Zausner's belief that Dent "possessed very few of the qualifications for the position." (Zausner Dep. Tr. at 319.)

Dent brings this action against the NTC, the USTA and Zausner under various federal and state anti-discrimination laws claiming that they did not promote him because of his race and/or age. Defendants move for summary judgment arguing that Dent has not come forward with any evidence from which a reasonable juror could conclude that the decision not to promote him was in any way motivated by his race and/or age. The Court agrees with defendants.

## DISCUSSION

I.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). On a motion for summary judgment, the trial court "must first resolve all ambiguities and draw all inferences in favor of the non-moving party, and then determine whether a rational jury could find for that party." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) (citation omitted). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000) (quoting Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991)). The non-moving party, however, "may not rely on conclusory allegations or unsubstantiated speculation" in seeking to avoid summary judgment, Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001) (internal citation omitted), and summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to

---

[1] Zausner also extended a courtesy interview to one other NTC Teaching Professional.

6

that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

II. Title VII

Title VII of the Civil Rights Act of 1964 "forbids employment discrimination on the basis of 'race, color, religion, sex, or national origin.'" Clemente v. New York State Div. of Parole, 684 F. Supp. 2d 366, 372 (S.D.N.Y. 2010) (quoting Richardson v. Comm'n on Human Rights and Opportunities, 532 F.3d 114, 119 (2d Cir. 2008) (quoting 42 U.S.C. § 2000e-2(a)(1)). Under the familiar McDonnell Douglass burden-shifting summary judgment standard applicable to discrimination claims, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. In a failure-to-promote case, the plaintiff bears the burden of demonstrating that: (1) he is a member of a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. See Aulicino v. New York City Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir. 2009) (citing Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d Cir. 2004)). Although plaintiff's burden at the prima facie stage is minimal, he must provide some competent evidence that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. See Patrick v. New York City Transit Authority, 2007 WL 2071555, at *11 (E.D.N.Y. July 16, 2007) (citing Cronin v. Aetna Life Ins., 46 F.3d 196, 204 (2d Cir. 1995)). If the plaintiff establishes a prima facie case, "[t]he burden then shifts to the employer who must provide a legitimate, nondiscriminatory business rationale to justify its conduct." Clemente, 684 F. Supp. 2d at 374 (citing Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)). The employer's burden is "not a demanding one." Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999). "If the employer provides such a rationale, the presumption created by the prima facie case 'drops

7

out,'" id. (quoting Roge v. NYP Holdings, Inc., 257 F.3d 164 (2d Cir. 2001)), and the burden shifts back to the plaintiff to show that the employer's stated reason is "a pretext for unlawful discrimination." Davis v. Dep't of Veterans Affairs, 178 Fed. App'x 51, 52, 2006 WL 116093 (2d Cir. Apr. 25, 2006). In determining whether Dent has met his burden, the Court should not second guess the employer's business decision, and "[e]vidence that an employer merely used poor business judgment . . . is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons." Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988) (citation omitted). "Only when an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual." Fleming v. MaxMara USA, Inc., 371 Fed. App'x 115, 118, 2010 WL 1170247, at *2 (2d Cir. Mar. 25, 2010) (citing Dister, 859 F.2d at 1116).

Defendants do not dispute that Dent has met his prima facie case on the first, third, and fourth elements of his failure-to-promote claim. They contend, however, that Dent has not met his prima facie case of demonstrating that he was qualified to be the Director of Tennis. The Court need not determine whether Dent has met his prima facie case because even if he has the defendants have articulated a non-discriminatory, legitimate reason for hiring Kraft rather than promoting Dent: Kraft was better qualified. Among other things, defendants point to Kraft's responsibilities as the Director of Tennis for the City of Fort Lauderdale where he hired and supervised tennis professionals, maintenance staff and clerks, developed and promoted new tennis programs, developed and administered an annual million dollar budget, managed more tennis courts than there are courts at the Billie Jean King National Tennis Center, and was responsible for holding the National Parks Championship, a tournament that Zausner considered to be the "most cumbersome tournament one can operate in the country . . . more complicated

8

than operating the U.S. Open." In addition, Kraft received a highly favorable recommendation from a NTC board member. These reasons, coupled with Zausner's belief that Dent was not qualified to be the NTC's next Director of Tennis, are sufficient to overcome any prima facie case of discrimination. See e.g., Milano v. Astrue, 2008 WL 4410131, at *30-31 (S.D.N.Y. Sept. 26, 2008) (citing cases and noting that employer overcomes prima facie case by coming forward with evidence that chosen applicant had requisite experience and that employer was concerned with plaintiff's ability to handle certain aspects of position) (citing Bickerstaff, 196 F.3d at 446; Alvarez v. Nicholson, 2005 WL 1844595, at *4 (S.D.N.Y. Aug. 3, 2005) ("Evidence that a more qualified candidate was selected for the open position will rebut any presumption that discrimination was involved in the employment decision.") (citing Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130 (2d Cir. 1996)).

A plaintiff may defeat summary judgment when his employer rebuts the prima facie case by coming forward with sufficient evidence from which a reasonable juror could conclude that his credentials are "so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" Byrnie, 243 F.3d at 103 (quoting Deines v. Texas Dep't of Protective & Regulatory Servs., 164 F.3d 277, 280-81 (5th Cir. 1999)). Dent has not done so.

Dent's opposition papers are devoid of any argument that his qualifications were superior to Kraft's and he admits that, unlike Kraft, he has never been responsible for overseeing the daily programming, maintenance and upkeep of 44 courts at nine different facilities, managing a million dollar budget, or supervising a staff of 22 individuals. (Dent Dep. Tr. at 314.) Moreover, Dent's claim made during his deposition that he was more qualified than

9

Kraft because he had more international experience, specifically citing to his service in the early to mid 1980s as a Special Consultant to the Lawn Tennis Association of Trinidad and Tobago and as the National Trainer for the Ivory Coast, is unavailing; even construing the experiences in the most favorable light to Dent, the undisputed fact is that they occurred nearly 30 years ago and his resume indicates that since that time he has been almost exclusively a tennis coach or instructor. Dent's claim that his national experience as the NTC's Director of Tournament Training trumps Kraft's regional experience as the Director of Tennis for Fort Lauderdale is similarly unavailing; he concedes that the Director of Tournament Training title does not exist at the NTC and that he simply gave himself the title to reflect what he believes are his responsibilities in connection with his involvement with a NTC training program. (Dent Dep. Tr. at 166.) In any event, whatever his title in the training program, his responsibilities are focused on tennis teaching and training.[2]

As for supervisory responsibilities, Dent admits that he does not have any authority to discipline his fellow teaching professionals and that his supervisory responsibilities are limited to "talking" to the other teaching professionals if he believes that they are not doing their jobs properly. (Dent Dep. Tr. at 158.) He admits that he has never had hiring capacity at any of his previous jobs and that the only jobs at which he had firing capacity was his job nearly 30 years ago at the InterContinental Hotel in the Ivory Coast and his job more than 10 years ago at a private tennis club in New Jersey where he supervised four groundskeepers and stringers. (Dent Dep. Tr. at 159-163.) As for budgeting experience, he admits that it has been limited to purchasing nets, tennis balls, bucket, sneakers and tennis rackets at some of his prior jobs; he did not recall the dollar amount of the budget. (Dent Dep. Tr. at 162.) In sum, the Court finds

---

[2] Dent's main contribution in this role was the development and training of a "new form of competitive drilling and guided discovery." (Pl's Counter-Statement of Material Facts ¶ 144.)

that Dent's personal belief that he was more qualified than Kraft is unavailing as the evidence demonstrates to the contrary. See Holt, 95 F.3d at 130.

Perhaps realizing as much, Dent argues that summary judgment should be denied because a reasonable person could find pretext from the fact that the defendants have changed the qualifications for the position for the purposes of this litigation. That is, Dent argues, although the Director of Tennis position has always been primarily, if not entirely, an "overseer of other tennis professionals" (Tr. of Oral Argument at 4.), the defendants, in an effort to cover up their race and age discriminatory animus, have changed the position's qualifications so that it appears to the Court that the position has more of an administrative and managerial focus than it actually does. As evidence of this purported cover up, Dent relies heavily on what he characterizes as the defendants' initial job description for the position, which he contends makes clear that "apart from a toss away line of having a combination of playing and management experience that the position was more of a leader of the other tennis professionals."

It is true, as Dent contends, that the defendants' job description contained a list of "qualifications" that the defendants required of the successful applicant, including that he or she possess, among other qualifications, a bachelor's degree, 7-10 years of tennis education experience, tennis-teaching ability and an extensive tennis background. And it is also true that a reasonable juror could conclude that Dent possessed some of the listed qualifications.[3] But

---

[3] Included in this list of qualifications was that the successful applicant have "[t]ennis-playing ability (with a history that includes being a ranked player preferably)." Dent argues that defendants' inclusion of the "concededly" irrelevant requirement that applicants have a history of being a ranked player is further evidence of discriminatory intent because the defendants are aware that African-American candidates are less likely to have histories of being ranked players than Caucasian candidates as a result of having been forced to compete during an era of racial segregation in competitive tennis. The Court does not agree that a reasonable juror could conclude pretext for discrimination. For one, Dent misstates the record. Dent does not point to any admission by the defendants that the qualification is irrelevant. To the contrary, Zausner

11

Dent's argument that a reasonable juror could conclude that the defendants have changed the qualifications in an effort to cover up their discrimination finds no support in the record.

As an initial matter, the Court is confused by Dent's continued reference to the position as it was "originally offered" and "initially intended." As far as the Court can tell -- and Dent offers no evidence to the contrary -- the defendants used one internal job description for the position and did not change the description. Further, Dent's suggestion that the job description, save for a "toss away line of having a combination of playing and management experience," reveals that the position is merely a "leader" or "overseer" of the other tennis professionals is unavailing because even a cursory review of the job description indicates that the defendants were expecting more from the successful applicant. For example, the job description makes clear that defendants sought someone who was capable of being:

> responsible for the management of the department including all tennis programs, events, and tournaments; the hiring, training, and development of the entire NTC Programs staff; to be an industry leader, publicly representing the ideals of the USTA. Directly responsible for the day-to-day operational leadership of the department.

---

testified that the qualification though "not essential" was "relevant" because it was his belief that the ability to market the Director of Tennis as a former ranked player would give the NTC greater credibility when recruiting players for its training and tournament programs. Zausner also believed that having a history of being a ranked player would give the Director of Tennis greater credibility with the NTC's teaching professionals who report to him. (Zausner Dep. Tr. at 249-52.) The Court defers to defendants' decision to include this qualification. See O'Leary v. NY State Unified Court System, 2007 WL 2244483, at *7 (S.D.N.Y. Aug. 6, 2007) ("Defendant's decisions regarding the professional experience and characteristics sought in a candidate, as well as the search committee's evaluation of Plaintiff's qualifications are entitled to deference.") (quoting Sarmiento v. Queens College, 386 F. Supp. 2d 93, 97 (E.D.N.Y. 2005); see also Sulehria v. City of New York, 670 F. Supp. 2d 288, 309 (S.D.N.Y. 2009) ("[E]mployers have broad discretion to determine the necessary job qualifications."). Moreover, aside from his conclusory allegations, Dent has not come forward with any evidence from which a reasonable juror could conclude that: (1) African-Americans were less likely to have a history or being ranked tennis players; and (2) the defendants purposely included this qualification as a way to discriminate against African-Americans candidates.

and whose major duties would include, among other things: (i) providing leadership and direction and coordinating all activities of the department in accordance with the goals and objectives of the organization; (ii) developing and administering a budget for program and event revenue and expenses; and (iii) developing a marketing strategy for programs and event promotions, developing tennis programs and enhancing the image of NTC. While being an "overseer" of the tennis professionals is certainly one of the Director of Tennis's responsibilities, it is one of many.[4]

Dent next argues that a reasonable juror could infer pretext from Zausner's conduct during the interview process. Specifically, Dent claims that although Zausner afforded Kraft an extensive interview, he gave Dent only a brief and perfunctory interview and failed to ask Dent for information regarding his experiences and qualifications despite (1) "having no knowledge of Mr. Dent's prior work experience," (2) Hamilton's belief that Dent's resume suggested that he was qualified for the position, and (3) Kantarian's instruction to Zausner to consider Dent a "serious candidate." The Court disagrees.

For one, Dent is simply wrong when he contends that Zausner had "no knowledge" of Dent's prior work experience before rejecting him. Zausner, of course, was aware of Dent's prior work experience from Dent's resume and from observing his work at the NTC. To the extent that Dent is complaining that Zausner failed to elicit from Dent those experiences and qualifications that Dent believed made him qualified for the position but that he failed to list on

---

[4] As additional evidence of a cover up, Dent further contends that a reasonable juror could find that the defendants' rationale that Kraft is better qualified is pretext because that rationale is "flatly contradicted" by the USTA's prior position that Dent's claims against it should be dismissed because it was not Dent's employer, that NTC was Dent's employer, and that it did not make "any decisions regarding the Director of Tennis position." The Court fails to see how the USTA's legal position that it is not liable under Title VII because it is not Dent's employer is contradicted by its position that Kraft is better qualified such that a reasonable juror could infer pretext for discrimination.

his resume evidences a profound misunderstanding of the job application process and the important role that resumes play in allowing employers to evaluate an applicant's suitability for a position. See e.g., Sulehria, 670 F. Supp. 2d at 309-310. Further, the record does not support Dent's contention that Kantarian instructed Zausner to consider Dent a "serious candidate." The only evidence in the record regarding this purported instruction is Zausner's testimony that Kantarian forwarded an anonymous recommendation from the parents of one of Dent's students and included a note stating "Let's take a look at this candidate." Moreover, Zausner testified that it was possible that Kantarian -- who Dent chose not to depose -- did not even know who Dent was when he wrote the note.

In any event, even construing all of the evidence in Dent's favor, summary judgment is warranted because Dent has not come forward with any evidence from which a reasonable juror could conclude that Zausner's decision not to promote him was borne of racial animus. At bottom, the relevant inquiry for the Court is whether Dent has come forward with enough evidence to satisfy his "ultimate burden of persuading the trier of fact that the defendant[s] intentionally discriminated against" him because of his race. Iuorno v. DuPont Pharmaceuticals Co., 129 Fed. App'x 637, 639 (2d Cir. Jan. 31, 2005) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)); Fisher v. Vassar College, 70 F.3d 1420, 1433 (2d Cir. 1995) ("it is not enough for a plaintiff to show that the defendant's non-discriminatory reason for its employment decision is pretextual. . . . The plaintiff must establish *both* that the reason was false, *and* that discrimination was the real reason") (internal citations and quotation marks omitted) (emphasis in original). More evidence than what Dent has offered is required for any reasonable juror to conclude that Dent's race was a factor, let alone a motivating factor, in Zausner's decision not to promote him. Dent does not contend that his race was ever discussed

by Zausner or any other executive during the hiring process. Nor, for that matter, does he contend that his race has ever been an issue in the ten plus years that he has worked at the NTC. Although "such evidence is not categorically required," its absence from this otherwise meager record is fatal to Dent's claim. See Davis, 178 Fed App'x at 52 (citing Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000) (attaching significance to these factors)).

Dent also argues that pretext can be inferred from the defendants' hiring practices. First, Dent argues that the fact that defendants' online application asks applicants to state their race is a "particularly suspect" inquiry that is additional circumstantial evidence of a "systemic bias against non-white applicants for supervisory positions." That there is a racial imbalance in the workplace is insufficient, by itself, to establish discrimination. See Santos v. Engelhard Corp., 2009 WL 2432736, at *13 (S.D.N.Y. Aug. 6, 2009) (citing Anderson v. Hertz Corp., 507 F. Supp. 2d 320, 329 (S.D.N.Y. 2007), aff'd, 303 Fed. App'x 946 (2d Cir. 2008)); Branch v. Sony Music Entm't Inc., 2001 WL 228108, at *6 (S.D.N.Y. Mar. 8, 2001), aff'd, 34 Fed. App'x 23 (2d Cir. 2002). Without statistical evidence such as the number of African-American applicants and the respective qualifications of each of the applicants, no reasonable juror could use this piece of information to infer that the decision not to promote Dent was motivated by racial animus. See Anderson, 507 F. Supp. 2d at 329.

Dent also argues that even though "admittedly not dispositive of discrimination" against him, Zausner's failure to hire an African-American for any position during Zausner's nine-year tenure at the NTC (despite his hiring of at least six Caucasians) and Kamperman's hiring of "virtually all Caucasian employees for supervisory positions," evidences intentional discrimination against African-American applicants and precludes summary judgment. The Court disagrees. No reasonable juror could conclude from this request on the defendants' online

application form -- which Dent did not even fill out as part of the application process -- that Zausner's decision not to promote Dent was motivated, even in part, by race.

III. ADEA

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The Second Circuit recently reaffirmed that the familiar McDonnell Douglas burden-shifting summary judgment standard applies to ADEA claims. See Miller v. National Ass'n of Securities Dealers, Inc., 703 F. Supp. 2d 230, 244 (E.D.N.Y. 2010) (citing Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010)). Although the burden of persuasion shifts back and forth, the ultimate burden remains on plaintiff to come forward with admissible evidence from which a reasonable juror could conclude that his age was the "reason" that he was not promoted. See Weiss v. JPMorgan Chase & Co., 2010 WL 114248, at *2 (S.D.N.Y. Jan. 13, 2010) (citing Gross v. FBL Services, Inc., --- U.S. ----, 129 S.Ct. 2343, 2350 (2009)).

Dent has not come forward with any evidence from which a reasonable juror could conclude that his age was a reason, let alone the reason, why he was not promoted. He does not contend that his age was ever discussed by Zausner or any other executive during the hiring process. Nor, for that matter, does he contend that his age has ever been an issue at the NTC. The only evidence in support of Dent's argument is the fact that Kraft is younger than he. It is well-settled that the mere fact that an individual younger than plaintiff was ultimately hired is insufficient to prove intentional discrimination. See Mattera v. JPMorgan Chase Corp., --- F. Supp. 2d ----, 2010 WL 3785576, at *13 (S.D.N.Y. Sept. 30, 2010) (citing Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998); Feldman v. Looms, Div. of Lewcor Inter., Inc., 198 F.3d 233,

1999 WL 973518 (2d Cir. Oct. 4, 1999) ("The fact that Stanley . . . was replaced by a younger employee also does not suffice to prove that the adverse employment action here was motivated by age discrimination.")). Accordingly, Dent's ADEA claims are dismissed.

IV. Section 1981 Claims

It is well-settled that the McDonnell Douglas burden-shifting framework that applies to Title VII claims also applies to discrimination claims under § 1981. Rowe v. Bell Atlantic, 2006 WL 297710, at *2 (E.D.N.Y. Feb. 7, 2006) (citing Mudholkar v. Univ. of Rochester, 229 F.3d 1136 (2d. Cir. 2000)). Thus, Dent's claims of race discrimination under § 1981 are dismissed.

It is also well-settled that § 1981 does not create a claim for relief based on age discrimination. Hogan v. J.P. Morgan Chase Bank, 2008 WL 4185875, at *3 (E.D.N.Y. Sept. 4, 2008 (citing Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998)). To the extent Dent asserts age discrimination claims under § 1981, those claims are dismissed.

V. NYSHRL Claims

The same burden-shifting framework and standard of proof that apply to Dent's Title VII claims apply to his race discrimination claims under the NYSHRL. See Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010); see also Cruz v. Coach Stores, 202 F.3d 560, 565 n.1 (2d Cir. 2000) ("Our consideration of claims brought under the state and city human rights laws parallel the analysis used in Title VII claims."). Accordingly, those claims are dismissed.

The same burden-shifting framework that applies to Dent's ADEA claims applies to his age discrimination claims under the NYSHRL. See Hirschberg v. Bank of America, N.A., --- F. Supp. 2d ----, 2010 WL 4872992, at *10 (E.D.N.Y. Dec. 1, 2010) (citing Davey v. Jones, 371 Fed. App'x 146 (Mar. 29, 2010)). In light of the Supreme Court's holding in Gross, 129 S.Ct. 2343 (2009), however, it is unclear whether age discrimination claims under the NYSHRL and claims under the ADEA share the same standard of proof. Before Gross, plaintiffs bringing

NYSHRL claims were subject to the same standard of proof as plaintiffs bringing ADEA claims, that is, they bore the burden of demonstrating that age was a motivating factor in the adverse employment decision taken against them. See Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 n.3 (2d Cir. 2007). Gross changed the standard of proof for ADEA claims, holding that plaintiffs must establish that age was the "but-for" cause of the action. The Second Circuit has not decided whether Gross also changed the standard of proof for NYSHRL claims such that plaintiffs now need to prove "but-for" causation, see Hirschberg, 2010 WL 4872992, at *10, and the parties have not briefed the issue. The Court need not decide the issue because even if Dent need only establish that his age was a motivating factor in Zausner's decision, he has not come forward with any evidence from which a reasonable juror could conclude that was the case. Accordingly, Dent's age discrimination claims brought under the NYSHRL are dismissed.

VI. NYCHRL Claims

The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005), requires that claims brought under the NYCHRL be evaluated separately from their federal and state law counterparts, such as Title VII, the ADEA and the NYSHRL. See Kolenovic v. ABM Industries Inc., 361 Fed. App'x 246 (2d Cir. Jan. 21, 2010) (citing Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (explaining that the Restoration Act "abolish[ed] 'parallelism' between the [NYCHRL] and federal and state anti-discrimination law"); see also Williams v. New York City Housing Authority, 61 A.D.3d 62 (1st Dep't 2009) (trial court's "decision dismissing the action failed, however, to properly construe plaintiff's claims under the local Restoration Act, which mandates that courts be sensitive to the distinctive language, purposes, and method of analysis required by the City HRL, requiring an analysis more stringent than that called for under either Title VII or the State HRL"). The parties have not addressed the

standards to apply to Dent's NYCHRL claims, and the Court declines to exercise jurisdiction over them. See e.g., Kolenovic, 361 Fed. App'x 246 (noting that "the district court may consider that this area of law would benefit from further development in the state courts, and for that reason dismiss the claim without prejudice to refiling in state court.")

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      January 21, 2011                         s/ Judge Raymond J. Dearie

                                                   RAYMOND J. DEARIE
                                                   United States District Judge